UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| MERRI R.[1], | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|   v. | )   CIVIL NO. 2:21cv298 |
| | ) |
| KILOLO  KIJAKAZI, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) under the Social Security Act, 42 U.S.C. § 423(d). Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12 months. . . ."  42 U.S.C. §416( i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity.  *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings."  *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law."  *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after a hearing, the Administrative Law Judge ("ALJ") made the following findings:

1.    The claimant last met the insured status requirements of the Social Security Act on September 30, 2020.

2.      The claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 1, 2000 through her date last insured of September 30, 2020 (Exhibit 11D) (20 CFR 404.1571 *et seq.*).

3.      Through the date last insured, the claimant had the following severe impairments: mild degenerative joint disease of the bilateral feet; bilateral degenerative changes of the bilateral knees, status post left knee replacement; plantar fasciitis; obesity; anxiety; major depressive disorder and borderline intellectual functioning (20 CFR 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b). The claimant can lift/carry 20 pounds occasionally and 10 pounds frequently; sit for six hours in an eight-hour workday; stand/walk for four hours in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; never climb ladders, ropes or scaffolds; can understand, remember and carryout simple, repetitive tasks; maintain adequate attention and concentration; interact appropriately with coworkers and supervisors; occasionally have brief, superficial interaction with the general public; no fast paced production or quotas, limited to concrete job tasks with no requirement of independent decision making and only occasional changes in the work setting.

6.      The claimant has no past relevant work (20 CFR 404.1565).

7.      The claimant was born on June 19, 1969 and was 51 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.      The claimant has a limited education (20 CFR 404.1564).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from November 1, 2000, the alleged onset date, through September 30, 2020, the date last insured (20 CFR 404.1520(g)).

(Tr. 1508-1527).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits, leading to the present appeal.

Plaintiff filed her opening brief on January 18, 2022. On March 7, 2022, the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on March 29, 2022. Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded for an award of benefits.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). In the present case, Step 5 was the determinative inquiry.

4

Plaintiff filed an application for DIB on September 29, 2015, alleging disability beginning on November 1, 2000. (Tr. 204-207). This application was initially denied on February 2, 2016, and upon reconsideration on June 18, 2016. (Tr. 132-135; 140-146). On November 16, 2017, Plaintiff testified at an administrative hearing in Valparaiso, Indiana before ALJ Shane McGovern. (Tr. 39-103). On March 2, 2018, ALJ McGovern issued an unfavorable decision. (Tr. 18-38). The Appeals Council denied review on October 16, 2018. (Tr. 5-12). Subsequently, Plaintiff filed an appeal with the this Court and the case was remanded.[2] (Tr. 1628-1644).

Plaintiff attended a second hearing on March 3, 2021, before ALJ Romona Scales. (Tr. 1537-1587). On May 25, 2021, ALJ Scales issued an unfavorable decision. (Tr. 1502-1536.) The ALJ found that Plaintiff could perform the jobs of marker, garment sorter, and router and was therefore not disabled. (R.1526-1527).

On December 6, 1993, at the age of 24, Plaintiff underwent a psychological evaluation that documented a prior report of cerebellar atrophy and a history of special education. (Tr. 371). Plaintiff was observed to have a speech impediment but her speech was intelligible. (Tr. 372). On a full-scale intelligence test she achieved a full-scale IQ score of 77, placing her in the Borderline Intellectual Range. *Id*. The examiner opined that Plaintiff was not capable of handling her own funds. *Id*.

On June 11, 2010, Plaintiff was admitted inpatient to St. Margaret Mercy after voicing suicidal ideation with a plan to overdose on medication. (Tr. 1408). Plaintiff was noted to have been admitted in the past "numerous times" with the most recent being a 2006 admission for suicidal ideation. (Tr. 1411). It was observed that Plaintiff had somewhat limited cognitive

---

[2] 2:19cv21-JD.

abilities and struggled to explain what happened. *Id*. She was observed to have somewhat
"child-like" speech, displayed a circumstantial thought process, and was opined to have poor
coping skills. (Tr. 1412). She was kept inpatient until June 15 and at discharge she was asked to
follow up with therapist Donna Ruebensam. (Tr. 1410).

On October 27, 2010, Plaintiff was again admitted to St. Margaret for an overdose of
medications in an attempt to commit suicide. (Tr. 1336). She reported that she also contemplated
stabbing herself. *Id*. She was observed to have a restricted affect, concrete thought process at
times, displayed limited insight and judgment, as well as limited impulse control. (Tr.1338). She
was discharged on November 2, 2010 to be followed as an outpatient. *Id*.

On April 6, 2011, Plaintiff was yet again admitted to St. Margaret for expressing suicidal
thoughts. (Tr. 1378). She had stolen money from a laundromat where her 18-year old friend
worked. *Id*. Her father had threatened to put a restraining order against Plaintiffs' 18-year-old
friend because that individual was exploiting Plaintiff. *Id*. She was described as having "limited
intellectual abilities." *Id*. Her thought process was described as somewhat concrete and her
insight and judgment were limited. (Tr. 1379). She appeared despondent and was once again
described as having poor coping skills. (Tr. 1382). She was discharged two days later with
instructions to follow up with psychiatric nurse, Faith Ornelas, and her therapist. (Tr. 1379). She
followed up with Faith Ornela, CNS, for individual psychotherapy. She was observed to be
dysphoria and irritable, with somewhat limited insight and judgment, and a concrete thought
process. (Tr. 556-557). Ms. Ornelas made particular note of the fact that Plaintiff had the
assistance of her parents to help her maintain her safety in and outside of her home. (Tr. 557).

On January 4, 2012, Plaintiff reported what seemed to be an anxiety attack while with her

mother at a laundromat. (Tr. 568). She reported continued breakthrough anxiety. *Id*. Once again it was noted that Plaintiff's insight and judgment "are somewhat limited, but she has the assistance of family to help her maintain her safety in and outside her home." *Id*. Later that year, in July of 2012, it was noted that Plaintiff's mother was responsible for Plaintiff's medications but was concerned about an increase in medication due to Plaintiff becoming overly sedated as well as concern about her history of multiple medication overdoses. (Tr. 570). It was noted that Plaintiff's depression symptoms remained unchanged because she had been unable to implement any behavioral initiatives, remained very inactive throughout the day, continued to worry excessively about her friends and what others thought of her, worried that something bad might happen at different points throughout the day, had a history of poor anger management, had fleeting thoughts of suicide, and would buy things impulsively at thrift stores and garage sales, despite consistently attending individual counseling. (Tr. 570-571).

On September 25, 2012, despite compliance with medications due to being administered by her father, Plaintiff continued to report a low mood with "lots of hopelessness, helplessness, and thoughts of suicide." (Tr. 573). It was noted that she performed very little activity during the day and worked only 2 hours per week as a crossing guard. *Id*. Her concentration remained low, she had very low frustration tolerance, poor impulse control, chronic sadness, with low energy and low motivation. *Id*.

On July 17, 2014, Plaintiff's mother reported to Plaintiff's therapist that she was very concerned about her daughter because she was stealing her money and was becoming obsessive again with some of her relationships and hanging around a restaurant in a local area. (Tr. 388). The therapist, Donna Reubensam, LCSW, strongly encouraged Plaintiff's mother to try to set a

schedule and have a structure for Plaintiff at home as much as possible and to have her complete

chores and tasks around the house to keep her focused and busy. (Tr. 389). The following session

it was noted that Plaintiff had attempted to make friends at a local restaurant that she tended to

eat at occasionally, but felt that she was "being a pest and getting a cold shoulder there." (Tr.

386). She recognized that she was lonely but had difficulty with social skills and socializing. *Id*.

The following session she reports that she had been going to the restaurant and looking to talk to

some other people there but had been asked to leave. (Tr. 384).

On September 30, 2014, Plaintiff's treating psychiatrist, Dr. Jain, and treating therapist

Ms. Ruebensam completed a joint report of psychiatric status at the request of the Disability

Determination Bureau. (Tr. 527). The report noted that Plaintiff presented with a restricted affect,

would become anxious at times and forget what to say and be unable to remember her thoughts.

(Tr. 528). The report also noted that Plaintiff's father and mother had come to sessions

occasionally. *Id*. It stated that Plaintiff has bouts of depression where she is withdrawn and

isolates, lots of anxiety where she is unable to sleep much and has racing thoughts, and due to her

learning disability had difficulty with memory recall/comprehension. (Tr. 528). The report stated

that Plaintiff "has suffered from depression for many years" and "seems to need to keep herself in

a supportive environment to maintain a duration of stability." (Tr. 529). Plaintiff had difficulty

recalling digits backwards, found it hard to recall the news, could not recall three objects after

five minutes, could not complete a simple division problem or a simple subtraction problem. (Tr.

529-530). When asked to describe the difference and similarities between common items she

states that "cat is a female and the dog a canine" and was unable to explain the differences

between a hat and a coat. (Tr. 530). The report stated that Plaintiff required a lot of

encouragement and support to become involved with activities and at times would need ongoing

supervision or direction due to her learning disability. (Tr. 531). Plaintiff was noted as having a

limited number of friends, conflict in her family, and while she did relate in an open honest

manner with both her therapist and Dr. Jain, she was very sensitive to criticism from anyone. (Tr.

531). The report stated that Plaintiff seemed to demonstrate deterioration in her behaviors when at

home carrying out expectations from family members such as chores and assigned tasks,

expressing that "people stress her out and they expect too much from her." *Id*. Plaintiff was not

capable of managing any disability benefits if they were awarded. (Tr. 532).

On January 25, 2016, Plaintiff was seen for a consultative examination at the request of

the Disability Determination Bureau. (Tr. 1223). She was observed to arrive in sweat pants and

t-shirt and her shoes were torn and shabby. (Tr. 1225). She was unable to perform simple math

calculations and spoke with a slowed intonation. (Tr. 1225-1227). The examiner observed that

she appeared to be unable to manage her own funds and had a limited intellectual capacity. (Tr.

1228). The examiner noted that Plaintiff had maintained a part-time job for 26 years as a crossing

guard and had never lived independently. (Tr. 1228). The following month Plaintiff was seen for

a therapy session with Ms. Ruebensam and she reported feeling very saddened about being

rejected for Social Security disability benefits. (Tr. 1064). Plaintiff described herself as "fairly

functional" but did not feel that she could handle the daily stressors of life. *Id*. Her therapist

encouraged her to get an attorney that would help her obtain these benefits as "patient does not

appear at all capable of working under undue amounts of stress, definitely could not work a full

time job." (Tr. 1065).

On April 5, 2016, psychiatrist Kobi Douglas and therapist Donna Ruebensam, completed

9

a joint mental assessment of the ability to do work-related activities. (Tr. 1231-1232). It indicated that Plaintiff had poor/no ability to interact with supervisors, deal with work stresses, function independently, maintain attention/concentration, carry out complex job instructions, and relate predictably in social situations. (Tr. 1231-1232).

On March 21, 2018, Plaintiff reported worry about her future because her mother turned 80 and she does not know what would happen after she passes away someday. (Tr. 2189). Plaintiff did not feel that she could care for herself and was very concerned about that fact. Id. She was frustrated that she had been denied disability benefits and did not understand why it happened because her disability had been very limiting for her life and she needed supervision in many areas. *Id*. Her therapist encouraged her to appeal the decision. *Id*.

In February of 2020, Plaintiff reported that she had been waiting on knee surgery for over six months because she said the wrong thing to the previous surgeon and they canceled the whole appointment when her surgery was only two days away. (Tr. 2479). She indicated that she was angry and did not think before she spoke. *Id*. Later she reported that she had sabotaged her first scheduled surgery by calling the office and saying something inappropriate that concerned the office staff and so they canceled the surgery. (Tr. 2517).

At her most recent visit with her therapist, on October 30, 2020, Plaintiff was encouraged to consider the possibility of going to Regional Mental Health Center as had been discussed in the past. (Tr. 2537). The therapist indicated that this would be so that Plaintiff would have a case manager to check in on Plaintiff and help her with daily living skills as well as routine appointments. *Id*. At this point in time, Plaintiff's therapist had seen her for hundreds of individual therapy visits spanning nearly a decade. (Tr. 375-526; 554-936; 942-1222; 1241-1334;

1395-1404; 2126-2542).

Additionally, as early as October of 2014, Plaintiff was observed to be morbidly obese (BMI of 40+) with reduced strength in her lower extremities and complaints of knee pain. (Tr. 542). In November of 2015, knee x-rays showed moderately advanced degenerative changes with narrowing of the joint space. (Tr. 1490). In December of 2015, Plaintiff reported difficulty standing for more than 30 minutes at a time. (Tr. 937). In August of 2016, she reported foot pain with prolonged standing, observing symptoms increased after working as a crossing guard. (Tr. 1467). On August 23, 2019, Plaintiff was seen at her therapy session using a walker and had surgery scheduled for October. (Tr. 2405). She did later undergo a surgery in the form of a left total knee arthroplasty approximately a year later, after some delays due to her outburst, as previously indicated. (Tr. 2539, 2623). She was discharged with a walker. (Tr. 2624). She was to have surgery on the other knee scheduled in the near future. *Id*.

On February 12, 2021, Plaintiff's treating primary care physician, Dr. Samuel Gbenro, completed a physical residual functional capacity questionnaire. (Tr. 2656). He noted diagnoses of anxiety disorder and chronic knee pain. *Id*. He noted clinical signs in the form of swelling of the knees and restricted range of motion. *Id*. Dr. Gbenro opined that Plaintiff's depression, anxiety, and personality disorder would affect her physical condition as well. (Tr. 2657). He indicated that Plaintiff was incapable of even low stress jobs because there were a lot of rules that she could not follow. *Id*. He opined to a less-than-sedentary physical ability and indicated that Plaintiff required the use of an assistive device. (Tr. 2657-2659).

In support of remand, Plaintiff first argues that the ALJ erred in her evaluation of the medical opinion evidence. The ALJ rejected the opinions of longtime treating therapist Donna M.

11

Ruebensam and treating psychiatrist Dr. Ashish Jain, who provided detailed limitations supported by extensive explanation. (Tr. 527-532). The ALJ also rejected the joint report of Ruebensam and Dr. Dalal Ishani which provided similar findings. (Tr.1458-1459). Plaintiff contends that the ALJ never actually addressed the explanations that these treaters provided in support of their opinions, and instead simply lists evidence that she believes illustrate greater functionality or asserts purported, nonexistent, inconsistencies. (Tr.1523). *See Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) ("Being unable to discern how—apart from substituting his own judgment for that of the medical witnesses—the ALJ reached his determination regarding the degree of Rohan's impairments, we must reverse and remand for further proceedings.").

Here, the ALJ stated that Plaintiff was "not diagnosed with an explosive type disorder" and "was not diagnosed or treated with ADHD". (Tr. 1523). However, none of Plaintiff's treaters have even mentioned these diagnoses either in their treatment records or in their opinions regarding Plaintiff's function, and thus there was no inconsistency with the record.

In support of finding the treating providers' opinions to be worth little weight, the ALJ asserted that Plaintiff's cognition was normal and her thought process were generally intact, which she claimed was inconsistent with the opinions. (Tr. 1523). However, Plaintiff's treaters specifically acknowledged that Plaintiff was oriented times 3 and her thought process was linear, logical, and goal directed and she related in an open honest manner with her treaters. (Tr. 528, 531). They acknowledged that Plaintiff worked part-time, was able to drive, and was appropriately dressed. (Tr. 527-528). Nevertheless, they observed that Plaintiff also experienced bouts of depression where she became withdrawn and isolated, suffered from poor memory recall and comprehension, and needed to keep herself in a supportive environment to maintain a

duration of stability. (Tr. 528-529). They observed that Plaintiff required a lot of encouragement and support to become involved with activities, at times would need ongoing supervision or direction due to her learning disability, had a limited number of friends, and was very sensitive to criticism from anyone. (Tr. 531). Clearly, the record contains extensive evidence consistent with their opinions. (*See* Tr. 1832-1833 for a summary of just some of the many examples

Donna Ruebensam is a mental health expert who saw Plaintiff well over a hundred times during the period in question and provided detailed functional limitations supported by psychiatrists and consistent with her detailed notes that provide the vast majority of the insights into Plaintiff's function that are evidenced in the record. (Tr. 375-526; 554-936; 942-1222; 1241-1334; 1395-1404; 2126-2542). The regulations specifically emphasize that such sources "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations". § 404.1527(c)(2). Despite this emphasis, the ALJ never acknowledged the extensive treatment history that Ruebensam had with Plaintiff, thereby ignoring one of the primary factors identified by the regulations. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("[A]n ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion.").

Meanwhile, the ALJ gave "great weight" to the opinion of non-examining medical expert Dr. Kevin Schumacher and uncritically accepted his opinion despite major flaws in his testimony. (Tr. 1524). The regulations place greater scrutiny on non-examining sources, stating that "because nonexamining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide

supporting explanations for their medical opinions." § 404.1527(c). In this case, the ALJ asserted

that "the medical expert did have the benefit of reviewing the record as a whole" and his

"opinion is very consistent with the record". (Tr. 1524). However, the ALJ ignores the fact that

while Dr. Schumacher may have had access to the full medical record, his testimony clearly

indicated that he had not reliably reviewed it. The most obvious example of this is when Dr.

Schumacher testified that he did not see any hospitalizations for psychiatric purposes in the

record. (Tr.1565).

      In fact, the record contains multiple exhibits, consisting of over two hundred

pages, exclusively dedicated to Plaintiff's inpatient psychiatric hospitalizations and were

actually titled "Inpatient Hospital Records". (Tr.1336-1394; 1405-1431; 1849-2011). It is hard to

understand how even the most cursory of reviews of Plaintiff's medical record could overlook

these, particularly given that they are referenced repeatedly throughout the remainder of the

record. (Tr. 501, 887, 937, 2414, 2436, *et al*). Overall, the record contains evidentiary support for

a history of at least seven different psychiatric hospitalizations. (Tr. 501, 1336-1394; 1405-1431;

1849-2011). Despite Plaintiff's representative specifically objecting to Dr. Schumacher's opinion

on this basis, the ALJ makes no mention of this fairly incredible oversight. (Tr. 1830). Therefore,

the ALJ's explanation that greater weight could be given to this medical expert as a result of his

review of the whole record rings false and illustrates that the ALJ did not actually apply the

regulatory factors but rather seems to credit Dr. Schumacher's opinion simply because it was

consistent with her own.

      In response to Plaintiff's arguments, the Commissioner merely summarized the ALJ's

decision, declared it reasonable and conclusorily asserted: "In light of such evidence, the ALJ

reasonably chose to give reduced weight to the opinions of Ms. Ruebensam, Dr. Jain, and Dr. Ishani." (Def. Br. at 6). This is a very incomplete response which the Court considers a waiver of Plaintiff's arguments. *Frank R. v. Saul*, No. 3:20CV315, 2021 WL 236608, at *8 (N.D. Ind. Jan. 25, 2021) ("The Commissioner's failure to address any of Plaintiff's arguments on those points renders them waived."). Additionally, the Seventh Circuit has held that remand for benefits is appropriate in this instance. *Kaminski v. Berryhill*, 894 F.3d 870, 876 (7th Cir. 2018), *amended on reh'g* (Aug. 30, 2018), reversing for an award of benefits and stating: "once the treating physician's opinions are given the proper weight, the record compels the conclusion that Kaminski was unable to work and thus was disabled under the relevant statutes and regulations." *Id*. Here, considering the Commissioner's failure to address Plaintiff's arguments, there is no sound basis to dispute the opinions of longtime treating therapist Donna Ruebensam and treating psychiatrist Dr. Ashish Jain, who provided detailed limitations supported by extensive explanation (Tr. 527-532), as well as the joint report of Ruebensam and Dr. Dalal Ishani which provided similar findings. (Tr. 1458-1459); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument ... results in waiver."); *see also Garrison v. Colvin*, 759 F.3d 995, 1021–22 (9th Cir. 2014) (rejecting the Commissioner's argument that further proceedings would serve the "useful purpose" of allowing the ALJ to revisit the medical opinions and testimony that she rejected for legally insufficient reasons). Giving proper weight to these opinions would necessitate a finding of disability given that Plaintiff was opined as having "poor/none" ability to function independently and maintain attention/concentration and statements in the record that she "definitely could not work a full-time job". (Tr. 1065, 1458).

The Commissioner provides only slightly more response in regards to the opinion of Dr. Schumacher, arguing that it was appropriate for the ALJ to rely upon Dr. Schumacher despite massive oversights because "Dr. Schumacher acknowledged his oversight" and "the ALJ acknowledged that Plaintiff had questioned the adequacy of Dr. Schumacher's review, but the ALJ found that Dr. Schumacher's opinion was consistent with the evidence of record". (Def. Br. at 7). However it is not a question of whether the ALJ acknowledged Plaintiff's objection, it is whether the ALJ provided any good reason for dismissing the fact that Dr. Schumacher's statements illustrated a blatant unfamiliarity with the record. Moreover, the Commissioner fails to acknowledge that Dr. Schumacher's subsequent rushed explanation that the hospitalizations were solely in 2010 was also not accurate because Plaintiff had prior hospitalizations in 1991, 2003, 2004, and 2006, as well as a subsequent inpatient hospitalization in April of 2011, for suicidal thoughts. (Tr. 501, 1378). The Commissioner has offered no explanation as to how it was appropriate for the ALJ to rely upon Dr. Schumacher's "opportunity to review the full record" when it is clear that he did not do so and it appears that he barely read it at all given that these hospitalizations were referenced repeatedly throughout the record. Therefore, the Court will remand for an award of benefits for the reasons set forth above, due to the ALJ's errors in evaluating the medical opinions which consistently support Plaintiff's inability to engage in full-time, competitive employment.

Next, Plaintiff argues that the ALJ erred in her evaluation of the "C" criteria of the mental impairment Listings.  The ALJ concluded that the record failed to establish the presence of the "paragraph C" criteria of the Listing 12.02, 12.04, and 12.06. (Tr. 1510). In doing so, the ALJ never described the relevant aspects to the "C" criteria nor explained which aspects of the "C"

criteria she believed that Plaintiff did not meet. It is not clear from the ALJ's explanation whether she even understood what those criteria are and her summary of the evidence related to this issue does not make it readily apparent. One cannot simply presume the ALJ applied the correct criteria given that many ALJ's have incorrectly stated the standards and applied a stricter understanding of the first prong of the C criteria. *See Zieroth v. Saul*, No. 1:19-CV-181-DRL-JEM, 2020 WL 3490235, at \*4 (N.D. Ind. May 29, 2020), *report and recommendation adopted sub nom. Zieroth v. Comm'r of Soc. Sec.*, No. 1:19-CV-181 DRL-JEM, 2020 WL 3491979 (N.D. Ind. June 26, 2020); *see also Amanda S. G. v. Saul*, No. 1:18-CV-304 JD, 2019 WL 4594605, at \*7 (N.D. Ind. Sept. 23, 2019). The "C" criteria provision of the mental health Listings states:

> C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
>
> > 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
> >
> > 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

§ 404 Subpt. P, App'x 1 §§ 12.04C, 12.06C.

The ALJ asserted that the medical expert at the hearing acknowledged Plaintiff's long-term therapy and psychiatric treatment but did not feel that Plaintiff needed to live with her mother, observing that "it is not unusual nowadays for adult children to live with their parents." (Tr. 1510). The ALJ also stated that neither Plaintiff's psychiatrist nor her therapist opined that Plaintiff was dependent on her mother due to her psychiatric difficulties. *Id*. However, both of the statements fail to support the ALJ's conclusions. The first prong of the C criteria

requires medical treatment, mental health therapy, psychosocial support, or a highly structured setting. § 404 Subpt. P, App'x 1 §§ 12.04C, 12.06C. It does not require evidence of all four and yet the record establishes that Plaintiff can satisfy this first prong in a multitude of ways. Even the medical expert at the hearing acknowledged that plaintiff's mental health treatment was extensive, stating that "she has had medical treatment and therapy or a highly structured setting, she's certainly living at home with her mom, it's a point you can argue is a highly structured setting. But I think that typically means something more like a long-term care facility." (Tr. 1567-1568). Thus, the medical expert applied a narrower standard than the one outlined by the regulations and his own statement conceded that Plaintiff met the first prong. Furthermore, the statement that "it is not unusual nowadays for adult children to live with their parents", does not render that evidence irrelevant to the considerations of the C criteria. The fact that an adult woman in her 40s and 50s has never lived independently remains highly relevant to the question of whether she is in a highly-structured setting, requires psychosocial support, or whether her "adaptation to the requirements of daily life is fragile". 404, Subpt. P, App. 1, § 12.00(G)(2)(c).

The regulations state that psychosocial support means "[y]ou receive help from family members or other people who monitor your daily activities and help you to function." 20 § 404 Subpt. P, App'x 1, § 12.00D (2018). "For example, family members administer your medications, remind you to eat, shop for you and pay your bills, or change their work hours so you are never home alone." § 404 Subpt. P, App'x 1, § 12.00D (2018). Notably absent from this language is the requirement for a long-term care facility. Meanwhile, the record is replete with such evidence, including the joint statement by treating psychiatrist Dr. Jain and treating therapist Ms. Ruebensam stated that Plaintiff "has suffered from depression for many years" and "seems to

need to keep herself in a supportive environment to maintain a duration of stability." (Tr. 529).

Thus, contrary to both the ALJ's and the medical expert's assertions, Plaintiff's treating psychiatrist and therapist explicitly indicated that her dependence on others was due to her psychiatric difficulties. The ALJ's false statement cannot serve as substantial support for her conclusions. These opinions are also consistent with other extensive evidence of Plaintiff's dependence on her mother and father. Subsequent to Plaintiff's inpatient hospitalizations and immediately after observing that Plaintiff had limited insight and judgment, particular emphasis was placed upon the fact that Plaintiff had the assistance of her parents to help her maintain her safety in and outside of her home. (Tr. 557, 588). The record also documents that Plaintiff's medications were administered by her parents. (Tr. 570, 573). In July of 2014, Plaintiff's therapist encouraged Plaintiff's mother to try to set a schedule and have a structure for Plaintiff at home. (Tr3 89). In January of 2019, Plaintiff reported being more depressed and that she had ongoing struggles at home with being independent and hospitalization or a partial hospitalization program was discussed as a possibility with Plaintiff. (Tr. 2313-2314). Hearing testimony also established that Plaintiff's mother supervised her and reminded her of things, like getting her clothes ready for her, making the grocery lists for her, taking care of all the bills, and doing paperwork. (Tr. 69, 73, 85, 87). All of this evidence strongly supports Plaintiff's need for psychosocial support as described by the regulations and the ALJ erred by failing to acknowledge it. *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it.")

The ALJ states that Plaintiff "recently started going to planet fitness to work out and walked the neighborhood dogs independently." (Tr. 1510). It is not precisely clear what

aspect of the C criteria this relates to, but the ALJ's decision mentions Plaintiff's trips to Planet Fitness five times, repeatedly emphasizing this as evidence of Plaintiff's ability to be independent and socialize with others. (Tr. 1509, 1510, 1519, 1520, 1523). However, the record mentions of Planet Fitness and health clubs were in reference to struggles Plaintiff had in acting independently and needing to socialize more. (Tr.2198, 2336).

As early as 2012, Plaintiff's therapist was repeatedly encouraging her to try to join a health club because exercise could help her anxiety, help her manage her anger, and help to be more socialized. (Tr. 431, 635, 692, 994, 2219, 2277, 2284). However, despite years of encouragement, she only started attending in February of 2019, when her therapist noted that she has "attempted to go there a couple times" but "has a tendency to read into people's behaviors and feels like some people do not like her but has no rationale as to why." (Tr. 2336). Plaintiff's therapist encouraged her to try to use more logical thoughts in order to get her to return. *Id*. Thus, the record shows that despite years of contemplation and apparent interest in attending a health club such as Planet Fitness, Plaintiff attended just a few times and struggled with even doing that much. This is consistent with Ruebensam's and Jain's report that Plaintiff "requires a lot of encouragement and support to become involved with activities." (Tr .531). The fact that a few visits to the gym after years of encouragement was notable enough to remark on in therapy, even indicating that Plaintiff was "very proud of herself that she belongs to a health club in the local area", actually strongly suggests the inverse of the ALJ's conclusions and it remains unclear how this evidence relates to the C criteria or reflects negatively on it.

Likewise, the ALJ does not explain how walking dogs is particularly relevant to the C criteria. The record observed that Plaintiff enjoyed being around animals and found taking care

20

of a dog to be therapeutic. (Tr. 2526). Yet, the record also shows that Plaintiff struggled with training her dog who was chewing clothing and causing conflicts between her and her mother. (Tr. 882, 895). Another time Plaintiff was planning to euthanize her dog because he was sick only to be told that the dog was still in good health, with minor issues like an ear infection that could be treated. (Tr. 1318, 1320, 1322). Plaintiff reported that she felt like she could be a nuisance to people because she went over to a friend's house to help her walk her dog and the friend's husband was crabby toward her and wondering why she was there. (Tr .2270). While it is true that the record documents Plaintiff would dog sit it also indicates that she only does this for people she knows "very well" and is unclear how an activity that many school-age children perform constitutes persuasive evidence relating to the C criteria. (Tr. 2376, 2398).

Additionally, the ALJ stated that "there was some concern about the claimant's speeding, but the claimant seemed to understand the negative consequences, when explained" and "had no regular legal ramifications for speeding." (Tr. 1510). There are multiple problems with these statements. First, while the ALJ asserted that Plaintiff "had no regular legal ramifications for speeding", there is no evidence to support this but instead appears to be simply a negative inference on the ALJ's part. Second, contrary to the ALJ's statement, the record documents that Plaintiff did not understand the consequences of her speeding or else she ignored them. During a session with nurse practitioner Lindsey Kolakoski in December of 2019, Plaintiff, after some convincing, admitted to driving up to 110 miles per hour. (Tr. 2458). Most of that session was then spent talking about her speeding and its potential negative consequences. (Tr. 2459). The ALJ appeared to rely upon the fact that Plaintiff "expressed understanding" at this appointment in an attempt to minimize the impact of this behavior. (Tr. 1510). But the record

documents that Plaintiff continued to speed. Indeed, the very next month, in January of 2020, Plaintiff indicated that she had been speeding. (Tr. 2469). In February she again admitted that she was still speeding. (Tr. 2472). Following this, Nurse Kolakoski felt the need to re-emphasize the negative consequences of speeding but did not confront her about it as she was already sensitive about other confrontational issues that session. (Tr. 2476). It remains unclear how Plaintiff's continued intentionally reckless driving despite repeated reminders of the consequences reflects a factor that detracts from the C criteria.

The ALJ also asserted that, while the record documents a recommendation for access program/case management services "there is no indication that she had such services prior to her date last insured expiring." (Tr. 1510). However, whether Plaintiff actually had case management services prior to her date last insured is irrelevant because Plaintiff already had an existing support structure in the form of family. Case management was discussed in the larger context of the fact that Plaintiff's parents were getting older and she would no longer have someone to look after her. (Tr. 2537). In December of 2012, Plaintiff reported that she was very dependent on her mother and was not sure what would happen to her if anything happened to her mom. (Tr. 606). In August of 2013, therapy records document Plaintiff was "very concerned about her future as the patient is very dependent upon her mother for residence and general survival." (Tr. 484). It was noted that Plaintiff "had already spoken to other family members with regard to taking legal guardianship of her". *Id*. Therapy notes go on to note that Plaintiff expressed uncertainty about a future when her parents were no longer around and was hoping to learn more social skills to take care of herself. (Tr. 2204). In July of 2014, Plaintiff indicated that she "is aware of developmental limitations but states that she is not sure whether she could live independently without her

22

mother". (Tr .394). In October of 2015, Plaintiff talked about feeling reassured by feeling close

with her brother because "she does fear the idea of her mom not being here someday and that she

does not know who she will rely on, as patient will need some supervision in the future." (Tr.

682). In March of 2018, Plaintiff again reported that she needed a lot of supervision in many

areas. (Tr. 2189). Yet again, the ALJ does not acknowledge any of this evidence when discussing

the C criteria and her rationales strongly suggest that she misunderstood the requirements of the C

criteria.

The evidence above clearly establishes that Plaintiff met the first prong of the C criteria.

With regards to the second prong, the Social Security regulations articulate that the marginal

adjustment criterion is satisfied "when the evidence shows that, despite [the claimant's]

diminished symptoms and signs, [a claimant] ha[s] achieved only marginal adjustment." 20

C.F.R. § 404 Subpt. P, App'x 1, § 1200D(g)(2)(c) (2018). This criterion is further defined in the

regulations:

> "Marginal adjustment" means that your adaptation to the requirements of daily
> life is fragile; that is, you have minimal capacity to adapt to changes in your
> environment or to demands that are not already part of your daily life. We will
> consider that you have achieved only marginal adjustment when the evidence
> shows that changes or increased demands have led to exacerbation of your
> symptoms and signs and to deterioration in your functioning; for example, you
> have become unable to function outside of your home or a more restrictive
> setting, without substantial psychosocial supports (see 12.00D). Such
> deterioration may have necessitated a significant change in medication or other
> treatment. Similarly, because of the nature of your mental disorder, evidence may
> document episodes of deterioration that have required you to be hospitalized or
> absent from work, making it difficult for you to sustain work activity over time.

20 C.F.R. § 404 Subpt. P, App'x 1, § 12.00(G)(2)(c). Here, the record documents extensive

evidence of marginal adjustment that the ALJ either failed to consider or incorrectly identified.

For example, the ALJ appeared to place heavy reliance upon the fact that Plaintiff had "no complaints by an employer for many years" and " there were no notes that the claimant was ever reprimanded or that she could not handle any changes in policies, rules or procedures". (Tr. 1516). The ALJ's summary of Plaintiff's work history as a crossing guard makes it sound as though she has not only never had any issues there, but rather has excelled. (Tr. 1516-1517). The ALJ's recitation of this evidence is cherry-picking at its very worst. While it is true that Plaintiff takes great pride in her work as a crossing guard, the record is replete with documentation of struggles that Plaintiff has with this extremely part-time (variously described as only 2 hours per day or 2 hours per week) unskilled job despite having over two decades of experience with it. (Tr. 59-60, 228). Plaintiff repeatedly described her job as "very stressful". (Tr. 987, 1253, 1333, 2138, 2147, 2183, 2185, 2198, 2252, 2255, 2264, 2267, 2345, 2369, 2363, 2369, 2267). Plaintiff reported feeling "very suspicious of her coworkers" and feeling like they did not like her at times. (Tr. 1029). Despite being an unskilled job, Plaintiff was "under a lot of stress with so many rules and regulations being a crossing guard." (Tr. 2267). Plaintiff asserted that she was "very nervous about her job" because "she feels that she is being criticized a lot by her supervisor." (Tr. 2345). She reported arriving late and finding her supervisor waiting for her there and became tearful when discussing the stress she had with that job. (Tr. 2369). Plaintiff explicitly stated that she could not handle any more stress with a job. (Tr. 987).

A fundamental requirement of a logical bridge analysis is the decision's explanation why contrary evidence does not persuade. *See Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Here, the ALJ simply did not confront this evidence that Plaintiff's part-time work actually illustrates her minimal capacity to adapt to changes in her environment or to demands that are

24

not already part of her daily life. In August of 2017, Plaintiff reported to her psychologist Dr. Ishani Dalal that she was experiencing an increase in stress as a result of a change in the company that oversaw her crossing guard position. (Tr. 1333). She reported that this change in the company created a conflict because "there are times when she has to do what the company says." *Id*. She subsequently had increased stress to the point of considering quitting her job despite years of experience and loving it. (Tr. 2198, 2264, 2267). In other words, a simple change in her employer for a part-time unskilled job was enough to cause a marked increase in her stress levels to the point where she repeatedly emphasized this to her therapists.

Clearly, the record documents that Plaintiff required extensive therapy, regular psychiatric follow-ups and medication, as well as the extensive supervisory support of her family in order to maintain enough functionality to perform the demands of an unskilled, limited,  part-time work. Even with this structure in place, the record still documents difficulty in dealing with the stress of that job, unsafe behaviors, and interpersonal struggles. Instead of addressing the C Criteria and this evidence with any specificity, the ALJ relied upon unexplained and incomplete references to faulty rationales and a non-examining medical expert who had clearly not carefully reviewed the record.

In response, the Commissioner makes a conclusory statement that "considering quitting one's job, as Plaintiff did, is not such a deterioration in functioning." (Def. Br. at 9). The Commissioner cites no authority for this statement and simply glosses over the evidence illustrating a minor change in Plaintiff's limited part-time work necessitated numerous therapy sessions devoted to her increased anxiety. Moreover, while the Commissioner conceded that "all of this evidence reflects that Plaintiff experienced stress and difficulty in connection with her

job", the ALJ made no such acknowledgement.  The Commissioner is not permitted to advance

an analysis to explain the ALJ's conclusion which the ALJ did not provide herself. The ALJ

appeared to place heavy reliance upon the fact that Plaintiff had "no complaints by an employer

for many years" and " there were no notes that the claimant was ever reprimanded or that she

could not handle any changes in policies, rules or procedures". (Tr. 1516). The Commissioner, in

arguing that this error is somehow harmless, has effectively asked this court to simply reweigh the

evidence in favor of the ALJ's finding, as opposed to holding the ALJ to the substantial evidence

standard. This is improper. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("the

harmless error standard is not, as the Commissioner and district court seem to believe, an exercise

in rationalizing the ALJ's decision and substituting our own hypothetical explanations for the

ALJ's inadequate articulation").

As the record clearly shows that Plaintiff has met the C criteria of the mental health

Listings, this is another basis for remand for an award of benefits.

Next, Plaintiff argues that the ALJ's finding that Plaiintiff could perform light work is

erroneous. The ALJ limited Plaintiff to less than a full range of light work, except the she could

only stand/walk for four hours in an eight-hour workday. (Tr. 1510). The ALJ's explanation for

finding that Plaintiff remained capable of standing/walking for four hours in an eight-hour

workday is completely untethered to any medical evidence or opinion. The ALJ simply states that

she has "considered the claimant's physical impairments, including her obesity, when limiting the

claimant to light work with a reduction of standing/walking to four hours in an eight-hour

workday and limited postural activities." (Tr. 1521). The ALJ does not explain her finding and it

appears to be an attempt to avoid a Grids Rule finding because Plaintiff turned 50 on June 18,

26

2019, at which point she changed age categories to "Closely Approaching Advanced Age". 20

C.F.R. 404.1563. According to the Grid rules, if Plaintiff were limited to "sedentary work" she

would be found disabled as of her 50th birthday. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1,

Rule 201.14 (person aged 50–54 with a limited education, a history of unskilled work, and limited

to sedentary work).

  While the final responsibility for deciding the RFC is reserved to the Commissioner,

courts have stressed the importance of medical opinions to support a claimant's RFC, and

cautioned ALJs against relying on their own expertise in drawing RFC conclusions. The Seventh

Circuit has repeatedly stated that an ALJ may not "play[ ] doctor and interpret new and potentially

decisive medical evidence without medical scrutiny." *McHenry v. Berryhill*, 911 F.3d 866, 871

(7th Cir. 2018) (internal quotation marks omitted); *see also Lambert v. Berryhill*, 896 F.3d 768,

774 (7th Cir. 2018); *Akin v. Berryhill*, 887 F.3d 314, 317–18 (7th Cir. 2018); *Moreno v Berryhill*,

882 F.3d 722, 728 (7th Cir. 2018). In this case, the records that post-dated State agency review

were clearly new and potentially decisive because at the time of the State agency review Plaintiff

was not even claiming a physical impairment as the basis of her disability. (Tr. 109, 123, 224,

227). Further exacerbating her error is the fact that the ALJ did not need to rely upon her own lay

intuition because the record contained a medical opinion by Plaintiff's primary care physician that

addressed her physical impairment and found that she was limited to sub-sedentary restrictions.

(Tr. 2656-2659).

  As early as October 11, 2014, prior to her worsening knee problems, Plaintiff was

observed to have a wide-based gait that was slow due to obesity, was unable to walk heel to toe

and tandemly, and was only able to get on and off the examination table and stand from a sitting

position with difficulty. (Tr. 542). But more critically, on September 9, 2019, Plaintiff was observed to walk with a slowed gait with a walker. (Tr. 2415). Plaintiff subsequently had a knee replacement surgery over a year later on October 20, 2020. (Tr. 2623). She was discharged with a walker. (Tr. 2610). She was still attending physical therapy as of December 30, 2020 and was scheduled for a right knee procedure on January 28, 2021. (Tr. 2555). Even if the ALJ's assertion of recovery in February of 2021 were credited, it still means that the ALJ failed to account for Plaintiff's function for a period of well over a year wherein the evidence illustrated not just an inability to perform light work, but the need for a walker. The ALJ never confronts this evidence nor explains how a morbidly obese individual who required knee surgery and a walker could nevertheless stand and walk for four hours a day. *See Walker v. Berryhill*, 900 F.3d 479, 484 (7th Cir. 2018) (Remanding where the ALJ erred by considering evidence from particular points during a broad period of time and failed to "remain watchful for the intermediate possibility of [the claimant] becoming disabled" for some shorter period that exceeded 12 months.).

The Commissioner again responds with an incomplete summary of the evidence, followed by a statement that "the ALJ stated multiple times that limiting Plaintiff to standing and walking for four hours in a workday, with postural restrictions, would account for Plaintiff's knee and foot impairments." (Def. Br. at 11). However, the issue is not whether the ALJ made such a statement. The question is how the ALJ determined that the evidence supported that conclusory statement. As this court has stated: "a summary is not an analysis, as it does not explain why the evidence summarized undermined Plaintiff's statements about his symptoms or limitations, or which statements were inconsistent." *Michael v. Saul*, No. 2:20CV238, 2021 WL 1811736, at *8 (N.D. Ind. May 6, 2021). This is the critical issue that the Commissioner repeatedly overlooks. In fact,

the Commissioner's response is so bare of analysis that it begs the question as to why they bothered to submit a response at all. This court has criticized exactly such responses, stating:

> Rather than meaningfully respond to legal arguments made by plaintiffs, the Commissioner's briefs have become little more than recitations of the factual findings of the ALJ… If legal arguments can be made in support of an ALJ's decision, they should be made. If no such arguments are available, then claims should be paid. This middle road, where appeals are contested but not meaningfully, is a disservice to claimants, taxpayers, and the Court.

*Clark v. Saul*, No. 1:20-CV-15-HAB, 2021 WL 164794, at *1 (N.D. Ind. Jan. 19, 2021). Here, the Commissioner's  response does not add anything of substance to the discussion of the issues. Given that correction of the ALJ's many errors can yield but one supportable conclusion, this Court will remand for an award of benefits. *Martin v. Saul*, 950 F.3d 369, 376 (7th Cir. 2020).

<u>Conclusion</u>

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED AND REMANDED FOR AN AWARD OF BENEFITS, in accordance with the applicable regulations.


 Entered: April 6, 2022.


                                                  s/ William C.  Lee
                                                  William C. Lee, Judge
                                                  United States District Court